DAVID DOBBIN, respondent,

*v.*

LENA PLAGER, appellant.

[Decided October 21st, 1920.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Backes, who filed the following opinion:

"This suit is to compel the defendant to convey to the complainant her property 216 Prince street, Newark, for $11,000 cash, in accordance with her agreement in writing to that effect.

"The answer is a categorical denial of the allegations of the bill, with the qualification that the defendant denies 'that she voluntarily and consciously agreed to sell the property for' $11,000.'

"The meaning of this ambiguous phraseology was brought out at the trial where it was set up that the purchase price agreed upon was $15,000, and that when Mrs. Plager signed the contract it was with the understanding that that, and not $11,000, was stipulated. Counsel introduced considerable testimony in support, but did not press this defence on the argument, feeling, I assume, that he had failed in his proofs. That he had failed was obvious, as I shall proceed to point out:

"Max Ginsberg, a real estate agent, negotiated the sale. Dobbin was not his first prospect. Between the price demanded by Mrs. Plager of $13,000 or more [Mrs. Plager says $16,000], and the offer by Dobbin of $10,000, he effected a compromise at $11,000. Ginsberg, Mrs. Plager and a Mrs. Frank, a friend of Mrs. Plager, went to the law office of Lubetkin & Greenbaum to have the contract drawn. They waited for some time in the office before Mr. Lubetkin came in. He says that after the object of their visit was explained to him he told them Mr. Dobbin had

to be present, and he was telephoned for and came. Then ensued considerable haggling over the date of possession, the removal of a tenant, the division of the taxes, the commission of the agent, the amount of the deposit, and the like, but there was no question as to the price being $11,000. He says he got his instructions from all there—Mrs. Plager, Ginsberg and Dobbin—that he correctly incorporated them in the contract, read it to them, explained it in Yiddish—their mother tongue—and, assuming that they understood, had them sign in duplicate. He also drew a contract for the agent's commissions, two and one-half per cent. and a notice to the tenant to quit, which Mrs. Plager took away, together with a duplicate of the contract of sale and Dobbin's check for $300, the deposit. Before going she paid Lubetkin $3, her share of his charges. Greenbaum, his partner, and Dobbin and Ginsberg corroborate him.

The composite story of Mrs. Plager and her children runs about this way, although it clashes severely in spots: Ginsberg represented that he was the buyer; that he wanted the place for a shop and was willing to pay $15,000; that the contract was already prepared when she got to Lubetkin's office; that she signed it, believing it to be with Ginsberg, not with Dobbin, and that the consideration stated was $15,000; that Dobbin was not known to her in the matter—was not present during the negotiations nor at the signing of the contract; that she did not see him sign; that he came into Lubetkin's office as she passed out, and that she did not know that the $300 check was drawn by him. When she got home one of her daughters read the contract, and then she realized she had been swindled. The next day her tenant took the check to Dobbin with a request from her that he take it back and surrender the contract. He refused and after a few days Mrs. Plager cashed the check. She first consulted counsel two months later.

"Much, if not all, of this story is pure fancy, and its inspiration and development are not obscure. Mrs. Plager's children were opposed to her selling the home, and upon her return with the contract, and being told what had been done, they raised a rumpus—some because the price was not to their liking and

*92 N. J. Eq.* Dobbin *v.* Plager.

others because she sold at all—and to placate them and restore harmony she sought to have Dobbin release her. There was no thought at that time of having been swindled out of $4,000 by a false contract, for had there been, I feel quite sure Mrs. Plager's course would have been swift and drastic, far from the mild appeal to Dobbin's generosity. She made no complaint to either Lubetkin or Dobbin that they had cheated her—a most natural thing to do if she had been. She and some of the children say they charged Ginsberg with crookedness in the sale, which he denied, but even at that, they do not claim to have alluded to deception by falsification of the contract.

"If the scenes of hysteria and wailing, so dramatically described by the family as having followed Mrs. Plager's return with the contract, actually took place, of which I have grave doubts, they were due principally to the shock the children experienced when they learned that their mother had executed the threat she had made to sell out, and the thing they accommodatingly characterize as swindling was the price over which they affected astonishment and disappointment. They agitated themselves into a feeling that their mother had been outdone in the bargain, a feeling which the mother readily assimilated, or, rather, simulated, and which she did not hesitate to reinforce at the trial with statements of facts which she must have felt were unfounded. Her claim that the contract was prepared before she arrived at Lubetkin's office, her denial of the happenings in his office, as related by the four men present, and her repeated assertion that Dobbin did not participate in the negotiations, was not to her knowledge the purchaser and did not sign the contract in her presence, were all consciously made, knowing that they were untrue. The untruth of her statement that she passed Dobbin at the door coming in as she was going out of Lubetkin's office was self-evident, for she carried with her the contract Dobbin had just signed, which she afterwards gave to her counsel, who produced it at the trial on call.

"Mrs. Frank, who was taken along by Mrs. Plager as a companion and witness, and who undoubtedly knew what happened when the contract was made, was not summoned to the trial. It

was said she was sick, and I adjourned the hearing so that her testimony could be taken. She was not produced, although available, and the inference is that her testimony would have been unfavorable to the defendant's claim that she had been deceived into selling for $11,000.

"The deposit of the check after the unsuccessful appeal to Dobbin is significant of Mrs. Plager's belief in the binding force of the agreement at that time.

"Whether the price of $11,000 had been agreed upon previous to or upon the arrival of Mrs. Plager, Ginsberg and Mrs. Frank at Mr. Lubetkin's office is not clear, but I have no doubt that that sum was the consideration upon which the minds of the contracting parties ultimately met, and that the writing expresses the things Mrs. Plager and Dobbin agreed upon. Nor have I the least misgivings of Mrs. Plager's ability to take care of herself in her dealings with the men, or that advantage was taken of her. She is illiterate, it is true, but she thinks and talks in money keenly, as is traditional of her race, and she is experienced in the ways of business. The sum which she agreed to take was a fair price for her property, as the testimony shows.

"On the argument, Mr. Bradner, counsel for defendant, advanced three points not raised by the answer nor intimated during the course of the trial—(1) that the minds of the parties did not meet; (2) that there was overreaching in procuring the contract; (3) and his chief point, that there is an adequate remedy at law, and jurisdiction, therefore, should not be exercised.

"1. First, that the minds of the parties did not meet, notwithstanding the formal contract in writing, is based upon a bit of testimony culled from Mrs. Plager's jargon, as follows:

" 'Mr. Ginsberg give me the check and give me the paper to sign—I signed one paper—and I took the check and told him, Mr. Ginsberg, "I don't know what about this. I will come home and if it is not right I will give it to my children to read it. If my children tell me something is wrong I will give you back the deposit." He told me "all right," and he started to laugh at me.'

"His claim is, that as this was not specifically denied, it must be accepted as true and conclusive that the agreement was not

to be binding upon his client until approved by her children. The recital by the other witnesses, present at the execution of the contract, of what there occurred—and I must assume that they told all—is a positive and complete refutation. In the quest for the truth courts are not bound to accept as verity statements of incidents not directly denied, if the body of the testimony refutes them.

"Mrs. Plager's testimony just quoted was not adverted to by her counsel during the course of the trial as of the significance he attributed to it on the argument. The impression made upon me when given, and the interpretation I then placed upon it, was, that as Mrs. Plager could not read, and having signed the contract upon representation of what it contained, if the contract was not written as read and explained to her, and as to this she was to be informed by her children, then the check was to be returned and the contract at an end. It was in that sense of 'wrong' that I understand her testimony, and I am quite confident that that was also the understanding of counsel

"2. There was no overreaching. It seems that Mrs. Plager, shortly before, or about the time of the sale, had difficulties with some of her children, who were living with her, and had threatened to sell out so as to get rid of them. There is no evidence whatever that either Ginsberg or Dobbin knew of this, nor does it appear that Mrs. Plager acted impulsively, or that her motive was other than the good price she was to receive. I do not mean to imply that any of these things would be ground to relieve her of her bargain or to refuse its enforcement.

"3. The jurisdiction of equity to specifically enforce contracts for the sale of land is so firmly established in this state, and so universally acknowledged by bench and bar, that sporadic attacks of the undaunted upon its exercise, because there is an adequate remedy at law in damages, may be at this late date viewed with perfect complacency."

*Mr. Benjamin M. Weinberg,* for the respondent.

*Mr. Frank E. Bradner,* for the appellant.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Backes.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER, ACKERSON—15.

*For reversal*—None.